## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AVANTOR, INC.** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 26-2435** |
| | : | |
| **CLAUDIA BERRÓN** | : | |

**McHUGH, J.**                                                                                          **June 17, 2026**

### MEMORANDUM

This breach of contract case involves restrictive covenants in an employment-related agreement.  Plaintiff, a global holding company with its headquarters in the Philadelphia suburbs, seeks to prosecute its claim against one of its Canadian subsidiary's former employees in this judicial district.  Defendant, a former employee of that subsidiary, argues that the patchwork of relevant agreements and evidence the parties presented make clear that they must litigate this dispute in Canadian courts.  For the reasons discussed below, I am compelled to  agree with Defendant and will dismiss the company's Verified Complaint under the *forum non conveniens* doctrine, without reaching the question of personal jurisdiction.

### I.      Factual Allegations

#### A.  The Parties

Plaintiff Avantor, Inc. (Avantor) is a public Delaware corporation headquartered in Radnor, Pennsylvania.  Verified Compl. (Compl.) ¶¶ 2, 28, ECF 1.  Avantor is a parent holding company for subsidiaries.  Berrón Decl. ¶ 8, ECF 25.  Through its subsidiary chain, Avantor provides products and services to customers worldwide in the biopharma, healthcare, education and government, advanced technologies, and applied materials industries.  Compl. ¶¶ 2, 28.

Defendant Claudia Berrón is a citizen of Canada, Mexico, and Spain, who worked remotely from her home in Calgary, Alberta, Canada in increasingly advanced roles within the Avantor network of companies from July 1, 2018, up until her departure on March 19, 2026.  Berrón Decl. ¶¶ 1, 3; Compl. ¶¶ 41, 110; Berrón Supp. Decl. ¶¶ 3–4, ECF 34.

### B.  Berrón's Employment[1]

On July 1, 2018, Berrón started full-time employment with VWR International Co. (VWR), a Canadian subsidiary of an entity that Avantor acquired before her arrival.  Berrón Decl. ¶¶ 5–7; Offer Letter, ECF 25-2.  Throughout Berrón's tenure, VWR functioned as an independent operating company within Avantor's global corporate structure, distributing consumables and equipment to laboratories around the world.  Berrón Decl. ¶ 8; Hankamer Decl. ¶ 2.  Berrón's offer letter, addressed to her residence in Calgary and signed by one of VWR's Canadian-based employees, explained on letterhead from VWR in Ontario (but bearing an "avantor" logo in the righthand corner), that her employment was with "VWR International Co."; that she was required to sign a "Personal Services and Restrictive Covenant Agreement" (Employment Agreement) to receive an equity award issued by a different Avantor subsidiary; and that she would be "reporting directly to Michael Stubblefield," Avantor's then-chief executive officer (CEO), who was based in Radnor.  Offer Letter at 1–2; Berrón Decl. ¶ 10; Walker Decl. ¶¶ 2, 5, ECF 30.

---

[1] The résumé attached to the declaration of Avantor's Executive Vice President and Chief Human Resources Officer bears the file name "Berrón.Claudia-R.07.2023" and appears to represent that Berrón began working for "Avantor" earlier in 2015.  Hankamer Decl., Ex. A, ECF 29-2 at 3.  However, Berrón attests that that attachment is inaccurate; instead, she avers that she "worked for a Canadian consulting company unaffiliated with [Avantor] or its subsidiaries from 2010 through June 2018," during which time she consulted for various companies, including Avantor.  Berrón Supp. Decl. ¶¶ 3–4.  I do not see these discrepancies as material.

The Employment Agreement states that its contract with Berrón is between "Avantor, Inc., on behalf of itself and its affiliates," defined collectively as "Avantor," Employment Agreement, ECF 25-3 at 2, and that its obligations will "apply to any time during which [Berrón] was previously employed or engaged, or is in the future employed or engaged, by Avantor if no other agreement governs non-disclosure, non-competition and non-solicitation during such period," Employment Agreement § 16.   Additionally, the Employment Agreement states that it is "governed by the laws of the Province [of] Ontario and the federal laws of Canada applicable therein," and includes forum-selection and consent-to-jurisdiction clauses directing disputes with respect to the agreement to Ontario courts.  *Id.* § 18(a).

VWR has over 200 employees in Canada and facilities in two Canadian provinces.  Berrón Decl. ¶ 12.   During her employment, VWR handled Berrón's employment-related matters concerning compensation, payroll, taxation, health insurance, retirement savings plan, and human resources. *Id.* ¶¶ 13–14; *see* ECF 25-5.  It is listed as Berrón's employer on her 2025 Canadian T4 Statement of Remuneration Paid, which she submitted to the Canadian Revenue Agency.  Berrón Decl. ¶ 15; 2025 Canadian T4 Statement of Remuneration Paid, ECF 25-6.  When Berrón sought a mortgage in 2021, VWR's Canadian HR department attested that the company had employed her since July 1, 2018.  ECF 25-7 at 2 ("This letter hereby confirms that Ms. Claudia Berrón is an employee of VWR International Co., part of Avantor, since July 1, 2018."). VWR never sought U.S. work authorization for Berrón, and she never paid U.S. taxes.  Berrón Decl. ¶¶ 18, 20.

While Berrón's job titles and seniority evolved over time,[2] her responsibilities remained global in nature. *Id.* ¶ 24; *see, e.g.*, Compl. ¶¶ 36–40, 42; Walker Decl. ¶ 13.  In her most recent

---

[2] In connection with a promotion in 2019, Berrón received a promotion letter bearing Avantor's Radnor, Pennsylvania address and stating that she would continue to receive a comprehensive benefits package as

role, Berrón worked as Senior Vice President and General Manager of Lab Specialty Products from July 2023 until her resignation in March 2026.  Compl. ¶ 40; Berrón Decl. ¶ 22.  In this role, she led a team of about 620 employees based around the globe, six of whom reported directly to her, including Berrón's "second-in-command," Walker Decl. ¶ 9; Compl. ¶ 46, a remote employee based in the Philadelphia area, Berrón Decl. ¶ 27.  The majority of her team worked abroad, with only three percent based in the U.S., including two employees (counting her second-in-command) based in Pennsylvania but not at Avantor's headquarters.  *Id.* ¶¶ 29–30.

Berrón's most recent position required frequent travel from Canada to Europe or to the U.S. when she was not working remotely from her home in Calgary.  *Id.* ¶¶ 31–32; Compl. ¶ 41.  This is at least partly because she did not have an office space in Canada and held minimal responsibilities for Canadian operations.  Berrón Decl. ¶¶ 24–25; Walker Decl. ¶¶ 11–12.  She had no such responsibilities in Pennsylvania.  Berrón Decl. ¶ 24.  The only U.S.-based location for which she was responsible was a mining manufacturing operation in Nevada with roughly fifteen employees.  *Id.* ¶ 25.  The lion's  share of her obligations covered manufacturing operations in South America, Australia, and Europe (of which the largest percentage was in Germany).  *Id.* ¶¶ 26, 29.

Berrón's travels to Pennsylvania concerned meetings with her team and the President to whom she reported, as well as periodic Board meetings.  *Id.* ¶ 33.  In her most recent role, the President to whom she reported typically held in-person, quarterly meetings at a company location: some meetings occurred in Bridgewater, New Jersey; others in Radnor, Pennsylvania; Florida,;

---

"a current Avantor employee."  Promotion Letter, ECF 29-3; *see* Compl. ¶¶ 36–37.  Berrón attests that she was promoted multiple times and that VWR always remained her employer.  Berrón Supp. Decl. ¶ 4.

Portugal; and Spain.  *Id.* ¶ 35; Compl. ¶¶ 51–52.  She had a security badge that granted her access to Avantor's headquarters as well as badges for locations she visited throughout its global corporate ecosystem.  Berrón Decl. ¶ 34; Compl. ¶ 43; Hankamer Decl. ¶ 8.  As part of her most recent position, Berrón presented at Board meetings—one or two of which she attended in person in Radnor or Bridgewater, and the remaining meetings remotely from her home in Calgary.  Berrón Decl. ¶ 36.  Within the last two years of her tenure, Berrón traveled to Radnor at least eight times, though the nature and ultimate purpose of those visits—whether they were for team or Board meetings—is unclear.  *See* Compl. ¶ 43; Hankamer Decl. ¶ 8.  Her final trips were to VWR's offices in Ontario and to Avantor's headquarters in Radnor during the last two weeks of her tenure, both of which required her in-person attendance to support the transition after her departure.  Berrón Decl. ¶ 37.

In 2024, Berrón began reporting to Corey Walker, President of Laboratory Solutions, who worked in Colorado (and later in Utah), and then on an interim basis, to Jim Bramwell, Executive Vice President of Sales and Customer Excellence, who worked in California.  *Id.* ¶ 23; Walker Decl. ¶ 17.  She resumed reporting to Walker in March 2025 and continued doing so until her resignation.  Berrón Decl. ¶ 23.  Her roles also included frequent email correspondence with various members of the extensive Avantor corporate structure.  Avantor produced a chart based on an internal analysis reflecting that from May 2021 up until her departure—a period covering time before she assumed her most recent senior vice president position—Berrón sent or received thousands of such emails from Pennsylvania-based executives, Hankamer Decl. ¶ 6; Walker Decl. ¶ 9, many of which she avers included her as a carbon-copy recipient among many recipients, and large email chains with several participants, Berrón Supp. Decl. ¶ 11.

## C. Equity Grants and Grant Agreements

As a form of compensation for her work with VWR, Berrón received equity grants under the "Avantor, Inc. 2019 Equity Incentive Plan," contemplating Berrón's compliance with restrictive covenants contained within the grants or referenced in other restrictive covenant agreements. *See* Equity Plan §§ 13(q), 2(o), 13(v), ECF 25-9; Compl. ¶ 57. In exchange for those equity grants, Berrón signed several agreements with restrictive covenants. Compl. ¶¶ 7, 57–60; RCA, ECF 1-3; Berrón Decl. ¶¶ 38–39. These grants and covenants are not specifically at issue here but provide context for the relationship between the parties.

Each equity grant was also subject to an agreement between Berrón and Avantor, all of which designate Delaware as the forum for disputes and Delaware law as controlling. *See, e.g.*, 2025 Grant Agreement § 5, ECF 25-8 at 4, 6 (defining Avantor as "Company" and explaining "[t]he term 'Company' as used in this [grant] Agreement (including any Exhibit attached hereto) with reference to employment shall include the Company, its successors and any of their respective Subsidiaries."); *id.* § 15 (Delaware forum-selection and choice-of-law clauses). The grant agreements included their own restrictive covenant agreements applicable to domestic- and foreign-based participants, respectively, with the latter stating that by signing the grant agreement, Berrón (as a foreign-based participant) was confirming to be (a) "party to an agreement with the Company which contains restrictive covenant obligations"; (b) reaffirming her "obligations under any such restrictive covenant agreement"; and (c) agreeing that any breach of those other restrictive covenant agreements would constitute "Detrimental Activity" under the Equity Incentive Plan. *Id.* § 17(b). The grant agreements also stated that the restrictive covenant provisions therein "will not be considered to supersede any prior non-competition, non-solicitation, or non-disclosure agreement between [Berrón] and the Company, which will remain in effect, and be read in

6

conjunction with [the restrictive covenant provisions therein] and any future agreements on the same subject matter, so as to afford the Company the broadest protections allowed under applicable law." *Id.* § 22.

### D. Avantor, Inc. Restrictive Covenant Agreement

In this action, Avantor seeks to enforce separate non-compete and disclosure provisions within the Avantor, Inc. Restrictive Covenant Agreement (hereinafter, RCA) that it alleges Berrón breached by (1) becoming the CEO of a company it considers a direct competitor within one year of her resignation, Compl. ¶¶ 10–11, and (2) refusing her then-boss's requests to disclose her new employer's name before she departed, *id.* ¶¶ 8, 104–05, 109; Walker Decl. ¶ 16.  But there is a threshold question before reaching the merits—where the dispute should be litigated.

The answer to that question turns primarily on the RCA's forum-selection and consent-to-jurisdiction clauses, which, unlike the equity grants specifying Delaware, provide  that unless an arbitration agreement applies, "the exclusive and mandatory venue for adjudicating any disputes under this Agreement will be the federal court or state court having original jurisdiction for [Berrón]'s last assigned work location for Avantor. [Berrón] and Avantor hereby consent to jurisdiction in such court for such purpose[.]" RCA § 2.2(B).  Additionally, the RCA identifies the controlling law stating that it "will be governed by, construed, interpreted, and its validity determined under the law of the State of Employee's last assigned work location for Avantor, without regard to such jurisdiction's conflicts of laws principles." *Id.* § 2.2(A).  And like the equity grants, the RCA also states that it is to "be read in conjunction with all prior and future agreements, to the extent enforceable, on the same subject matter so as to afford Avantor the broadest protections allowed under applicable law," *id.* § 1.10, and that it "does not supersede or replace

any prior agreements between the parties, including but not limited to any prior agreements that provide for restriction(s) on post-employment conduct," *id.* § 2.4.

## II.   Procedural Posture

On April 14, 2026, Avantor moved *ex parte* for a temporary restraining order to immediately enjoin Berrón's employment with its alleged competitor, which the Court granted that day. ECF 9. It did not disclose Berrón's employment agreement with its Canadian subsidiary. Once that was revealed, the TRO was vacated. The parties then stipulated to a bifurcated briefing schedule: first, to address the *forum non conveniens* and jurisdictional challenges Berrón raised in this Motion, deferring Avantor's motion for a preliminary injunction until this motion is resolved. ECF 22.

## III.   Legal Standard

Berrón moves to dismiss on two distinct bases, but this case is readily decided on one—*forum non conveniens* (FNC)—a discretionary tool that empowers federal courts to dismiss an action when "a foreign tribunal is plainly the more suitable arbiter of the merits of the case." *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007). Motions to dismiss based on FNC should be decided "at an early stage in the litigation, so that the parties will not waste resources on discovery and trial preparation in a forum that will later decline to exercise its jurisdiction over the case." *Lony v. E.I. Du Pont de Nemours & Co.*, 935 F.2d 604, 614 (3d Cir. 1991). Conducting the requisite analysis "does not call for a detailed development of the entire case" or "require extensive investigation." *Id.* (citations omitted). Rather, the court may rely on the parties' affidavits and other evidence presented. *See Van Cauwenberghe v. Biard*, 486 U.S. 517, 529 (1988) (instructing that a court can resolve an FNC motion "on affidavits presented by

8

the parties"); *accord Polanco v. Dom. Rep.*, 705 F. Supp. 3d 426, 434 (E.D. Pa. 2023) (McHugh, J.).

## IV.    Discussion

### A.  Canada is the proper forum in which to litigate this breach-of-contract dispute.

As noted above, the RCA's forum-selection provision states that unless an arbitration agreement applies, "the exclusive and mandatory venue for adjudicating any disputes under this Agreement will be the federal court or state court having original jurisdiction for [Berrón]'s last assigned work location for Avantor." RCA § 2.2(B).  Because the RCA does not define the term "last assigned work location," I must rely on the record that the parties produced to determine whether Berrón's last assigned work location was Canada or Radnor, Pennsylvania.

#### 1.  *Berrón's last assigned work location was Canada.*

To begin, VWR, a Canadian entity based in Ontario, hired Berrón, *see* Offer Letter; Berrón Decl. ¶ 10, paid her salary, handled taxation, provided her work benefits, administered her retirement savings plan, and appeared in government records as her employer, *see* Berrón Decl. ¶¶ 12–15; ECF 25-5; ECF 25-6.  In 2021, VWR also publicly attested to employing her since July 1, 2018.  ECF 25-7 at 2.  It never sought authorization for Berrón to work in the U.S., and she never paid U.S. taxes.  Berrón Decl. ¶¶ 18, 20.

Recently, the Delaware Court of Chancery faced similar facts involving Avantor and its subsidiary's former employee.  There, after Avantor sued its subsidiary's former employee to enforce restrictive covenants and prevent his use of confidential information, it contested whether he was the subsidiary's employee when he sued for advancement under Avantor's bylaws. *Centrella v. Avantor, Inc.*, No. 2022-0876, 2024 WL 3249274, at *1, 10–11 (Del. Ch. July 1, 2024), *aff'd*, 341 A.3d 505 (Del. 2025).  After a trial, the court concluded that the subsidiary

employed that individual, noting, among other things, that it paid his salary, "dominated" his hiring process, and appeared as his employer on his tax, payroll, and a "host of other internal documents—including expense reports and his employee benefits documentation." *Id.* at \*11.

Turning back to this case, while Berrón's July 2018 offer letter stated that she would report directly to Avantor's Radnor-based CEO, it was addressed to her in Canada, countersigned by one of VWR's Canadian employees, and appeared on VWR's Canadian letterhead. Offer Letter; Berrón Decl. ¶ 10. The "avantor" logo's presence in the offer letter's top-right corner carries little weight because that document, which accompanied the Employment Agreement, specifies in multiple places that Berrón was entering into an employment relationship with VWR. *See, e.g.*, Offer Letter at 2–3 ("our employment offer to you"; "[a]s an employee of VWR International"; "during your employment with VWR"). Although the Employment Agreement is titled "Avantor, Inc. Personal Services and Restrictive Covenant Agreement," it is between Berrón and "Avantor, Inc., *on behalf of itself and its affiliates*," which it then defines collectively as "Avantor." Employment Agreement at 2 (emphasis added); Berrón Decl. ¶ 11. That agreement "then refers to the 'Associate's employment with Avantor' (not Avantor, Inc.) and includes a modification provision that is designed to address '[a]ny change of employer *within Avantor (as defined above)*.'" *Centrella*, 2024 WL 3249274, at \*15 n.127 (quoting identical employment agreement between subsidiary's former employee and Avantor); *see* Employment Agreement at 2. Despite the presence of a promotion letter in the record lending some support to Avantor's position, *see supra* n.2, the balance of the evidence presented overwhelmingly shows that VWR, not Avantor, employed Berrón in Canada.

But even assuming that Berrón was an Avantor employee, she was based in Canada rather than in Radnor. When her duties did not require her to travel abroad, Berrón worked remotely

10

from her home in Calgary.  Berrón Decl. ¶¶ 31–32; Compl. ¶ 41.  Although she travelled frequently in her most recent role, her visits to Radnor were relatively infrequent, involving some quarterly team meetings (that also occurred in other locations), Berrón Decl. ¶¶ 33, 35; Compl. ¶¶ 51–52, and one or two in-person Board meetings at which her participation involved limited presentations.  Other meetings she attended remotely from Canada.  Berrón Decl. ¶ 36.  Avantor alleges that Berrón traveled to Radnor at least eight times over the last two years.  The nature and ultimate purpose of those trips—that is, whether they involved team or Board meetings, or she was merely passing through to another company site—is unclear in the record.  *See* Compl. ¶ 43; Hankamer Decl. ¶ 8.  Regardless, those visits were relatively few as compared to her trips to Avantor's other locations around the world where she had oversight responsibilities.  This is at least partially so because she was not responsible for any Pennsylvania operations, and her North American duties concerned a mining operation in Nevada and two small sites in Canada, with the bulk of her work covering operations in South America, Australia, and Europe.  Berrón Decl. ¶¶ 24–26, 29.

Moreover, Avantor's argument that she had badge-access to Avantor's headquarters in Radnor falters because she also had security badges to access locations throughout its global corporate ecosystem.  *Id.* ¶ 34; Compl. ¶ 43; Hankamer Decl. ¶ 8.  Avantor emphasizes Berrón's frequent contact with her deputy, a remote employee based in the Philadelphia area, Walker Decl. ¶ 9; Compl. ¶ 46; Berrón Decl. ¶ 27, but that hardly places *her* in Radnor.  She was ultimately responsible for a team of more than 600 members, most of whom worked overseas, and except when travelling, carried out her role from Canada.  Berrón Decl. ¶¶ 24, 27, 29–30.  Avantor has produced a chart based on an internal analysis representing that Berrón sent or received thousands of emails with Pennsylvania-based executives, Hankamer Decl. ¶ 6; Walker Decl. ¶ 9, but it is

11

hardly surprising that a high-ranking executive would participate in many email exchanges[3] with employees at the company headquarters. Once again, that does not make her work location Radnor.

In seeking a TRO, Avantor implied that Berrón was operating out of its Radnor location for some time at the very end of her tenure. But the record does not support that. At most, she visited headquarters as she had at various times during her tenure as an employee of Avantor's Canadian subsidiary. The common-sense conclusion supported by the record is that Berrón's last assigned work location was Canada.

### 2. *The forum-selection clause is valid and enforceable.*

Having concluded that Berrón's last assigned work location was Canada, I turn next to determine the forum-selection clause's enforceability. As an initial matter, federal law presumes a forum-selection clause's enforceability and validity absent a showing that enforcement would "be 'unreasonable' under the circumstances." *Foster v. Chesapeake Ins. Co.*, 933 F.2d 1207, 1219 (3d Cir. 1991) (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972)). Enforcement is considered to be "unreasonable where either the forum selected is 'so gravely difficult and inconvenient that [the resisting party] will for all practical purposes be deprived of his day in court,' or the clause was procured through 'fraud or overreaching,'" *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 232 n.14 (3d Cir. 2018) (quoting *Foster*, 933 F.2d at 1219), or compelling compliance would "contravene a strong public policy" of the forum, *see M/S Bremen*, 407 U.S. at 15; *accord Collins v. Mary Kay, Inc.*, 874 F.3d 176, 182 (3d Cir. 2017) .

---

[3] Avantor's chart does not reveal whether Berrón was the principal sender or receiver of the emails or simply copied. Nor does it reveal the focus of the email correspondence and includes emails dating back to well before she assumed her most recent role.

Avantor contests the clause's enforceability on the basis that it "designates a forum that does not exist or is impossible to satisfy." Opp'n Br., ECF 27 at 18–19 citing *BP Marine Americas v. Geostar Shipping Co. N.V.*, No. 94-2118, 1995 WL 131056 at *3 (E.D. La. Mar. 22,1995); *ORI, Inc. v. Lanewala*, No. 99-2402, 1999 WL 1423068 (D. Kan. Nov. 30, 1999); and *Kemper Mortgage, Inc. v. Russell*, No. 06-042, 2006 WL 355613 (S.D. Ohio Feb. 16, 2006)). But the deficits in the forum-selection clauses in those cases were of a far different nature. In *Lanewala* and *Russell*, the specifically named courts did not exist. In *Geostar*, a brief and somewhat cursory opinion, the court identified a variety of defects, including an attempt to circumvent federal maritime law. Here, the RCA uses generic language, in obvious recognition of the fact that employees within the Avantor network of companies work in multiple locations.

Avantor argues that because Canada has "provincial" rather than "state" courts, and its federal courts do not hear employment disputes, there is no "federal court or state court having original jurisdiction" in Canada that could hear this case. *Id.* at 18–19; *see* Totan Decl. ¶¶ 6–9, ECF 31. This is wordplay, not substantive legal analysis. Indeed, the very decision Avantor cites, *Fazio v. Altus Bus. Consultants Ltd.*, 2026 CanLII 480 (Can. F.C.), uses the term "Federal Court" in describing the Canadian judicial system, and its legal expert certainly knows that there is a presumption that employment matters are heard in provincial courts, *NIL/TU,O Child & Fam. Servs. Soc'y v. B.C. Gov't & Serv. Emps.' Union*, [2010] 2 S.C.R. 696 (Can.), which perform the exact same function as American state courts, *see, e.g., Titus v. Hack*, 2024 CanLII 3666 (Can. Ont. Sup. Ct. J.).

Avantor seeks to elevate semantics over substance. The import of the agreement is clear. The RCA itself states that it must be "read in conjunction" with prior agreements on "the same subject matter." RCA § 1.10. The Employment Agreement, which is between "Avantor, Inc., *on*

*behalf of itself and its affiliates*," Employment Agreement at 2 (emphasis added), expressly designates Canada for venue and jurisdiction purposes, *id.* § 18(a), and its obligations remain in effect, *id.* § 16.  And given the interrelationship between that initial Employment Agreement, and the RCA that Berrón signed alongside the grant agreements to receive equity awards, Pennsylvania law weighs against Avantor's narrow reading.  *See Huegel v. Mifflin Constr. Co.*, 796 A.2d 350, 354–55 (Pa. Super. Ct. 2002) ("Where several instruments are made as part of one transaction they will be read together, and each will be construed with reference to the other; and this is so although the instruments may have been executed at different times and do not in terms refer to each other.") (citation omitted). Furthermore, a court must view a contract's provisions in totality, *Lesko v. Frankford Hosp.-Bucks Cnty.*, 15 A.3d 337, 342 (Pa. 2011), construing them "to give effect to all of its terms," *Meeting House Lane, Ltd. v. Melso*,  628 A.2d 854, 858 (Pa. Super. Ct. 1993).

Here, the RCA's forum-selection clause links the courts having jurisdiction over the relevant contractual dispute to the geographic location where the employee was last assigned.  This expansive language makes sense given that Avantor is a parent-holding company with subsidiaries whose employees work on different continents around the globe.[4]  It understandably drafted the RCA to apply to a geographically disparate group of individuals whose work assignments could change during their tenure.  The most sensible interpretation of the phrase "state court" in the RCA is to apply it to the analogous court within the jurisdiction encompassing the employee's last assigned location, which in Canada is provincial courts.

---

[4] Its website represents that "Avantor's geographic footprint supports customers in 180+ countries" and that it is "operational in 30+ countries."  *Global footprint*, Avantor, https://perma.cc/Q6X4-FNCA?type=image last visited June 15, 2026).

It has long been the rule that courts must avoid construing contracts in a way that would produce "absurd results." *Harrity v. Cont'l-Equitable Title & Tr. Co.*, 124 A. 493, 494 (Pa. 1924). To accept Avantor's narrow reading of the term "state" would mean that as to any employee assigned to a foreign location, unless its local courts are referred to as "state" courts, by default their claims would be funneled to the Eastern District of Pennsylvania where it is headquartered, a result that makes no sense. And if Avantor intended such a result, the RCA could have so specified, just as Berrón's employment contract specified Canada, and the separate equity grants specified Delaware.

The RCA also links the controlling law to the employee's last work location, RCA § 2.2(A). Because I have found that to be Canada, Canadian law would also apply, for all the reasons set forth above, and particularly when one considers that the RCA itself must be "read in conjunction" with prior agreements on "the same subject matter." *Id.* § 1.10. Avantor repeatedly stresses that it is entitled to the "broadest protections," but that does not empower a court to ignore the evidence or the wording of the relevant agreements, because the protection Avantor claims is, by its own terms, limited to that "allowed under applicable law." *Id.* Avantor might be entitled to the benefit of the doubt if the issue were close, but it is not close here.

Avantor seeks to attach significance to the fact that the RCA includes state-specific provisions for four states, presumably to enhance the ability to enforce the covenants. I fail to see how the drafter's choice to address some jurisdictions individually but not others has any bearing on how the agreement generally should be construed.

In sum, Canada is the forum contemplated by the agreements.

15

3.  *The FNC doctrine, as modified by Atlantic Marine, directs this dispute to Canada.*

Given Berrón's last assigned work location was Canada, and the RCA's forum-selection clause is valid and enforceable, the final inquiry involves applying the FNC doctrine to this context.  In *Atlantic Marine Construction Co. v. U.S. District Court*, 571 U.S. 49, 63–64 (2013), the U.S. Supreme Court altered the traditional four-factor analysis, eliminating consideration of the plaintiff's preference and private interests when a valid forum-selection clause exists.  *See Collins*, 874 F.3d at 186. (listing four factors).  I may therefore consider only "the availability of an adequate alternative forum where defendants are amenable to process and plaintiffs' claims are cognizable," and relevant "public interest" factors affecting the forum's convenience, which "will overcome a forum selection clause in only the most 'unusual' and 'extraordinary' circumstances." *Id.* (quoting *Atlantic Marine*, 571 U.S. at 63–64).  The public interest factors may include "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *Atlantic Marine*, 571 U.S. at 62 n.6 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)).

Here, Canada is an available, adequate alternative forum where Berrón, as a Canadian citizen and current resident, is amenable to process and Canadian provincial courts can hear claims for breach of post-employment restrictive covenants.  As to the public interest, Avantor's legal expert cites reports about lack of resources in certain provincial courts, but the only specific benchmark he offers is that it takes a year to reach trial in Ontario, a timeline that is not alarming. ECF 31, para. 10. The local interest favors Canada, given that this case involves a Canadian citizen, who worked for a Canadian subsidiary of a global parent corporation, and the principal connection to Pennsylvania is that it is home to Avantor's corporate headquarters.  With the evidence

16

presented and the agreements in their totality pointing to Canada, I conclude that it has a stronger interest in having this breach-of-contract case decided under its own law concerning post-employment restrictive covenants. Moreover, Canadian courts will have greater familiarity on that question. On balance, these factors weigh in favor of dismissal. Therefore, combined with the availability of an alternative forum in Canada, Avantor fails to show "unusual and extraordinary circumstances" that overcome the RCA's forum-selection clause. *Atlantic Marine*, 571 U.S. at 63–64; *Collins*, 874 F.3d at 186.

Because the modified FNC doctrine compels the conclusion that Canada is the proper forum for Avantor's claim, I will dismiss the Verified Complaint on that basis alone and do not reach Berrón's personal jurisdiction defense. *See Sinochem*, 549 U.S. at 432 ("[A] court need not resolve whether it has authority to adjudicate . . . personal jurisdiction over the defendant if it determines that, in any event, a foreign tribunal is plainly the more suitable arbiter of the merits of the case."); *see, e.g., Levien v. hibu plc*, 475 F. Supp. 3d 429, 438 (E.D. Pa. 2020) (dismissing amended complaint based on FNC and declining to address personal jurisdiction) (Baylson, J.).

This Court understands Avantor's dismay over Berrón's conduct, particularly her lack of transparency as she contemplated her move. But the issue here is not one of equity, but of contract, and the evidence favors Defendant's position.

## V.     Conclusion

For the reasons set forth above, Defendant's Motion to Dismiss will be granted. An appropriate order follows.

 /s/ Gerald Austin McHugh  
United States District Judge

17